409 F.3d 555
 In re W.R. HUFF ASSET MANAGEMENT CO., LLC, Appaloosa Management, L.P. and Franklin Mutual Advisers LLC, Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd., and Argent Lowlev Convertible Arbitrage Fund Ltd., and the Commonly-Managed Funds UBS O'Connor LLC F/B/O UBS Global Equity Arbitrage Master Ltd. and UBS O'Connor LLC F/B/O UBS Global Convertible Portfolio and Eminence Capital LLC, on behalf of themselves and others similarly situated, Consolidated Petitioners (pursuant to 18 U.S.C. § 3771).
United States of America, Plaintiff,
v.
John Rigas, Timothy Rigas, Michael Rigas, Defendants.
 Docket No. 05-2619-OP(L).
 Docket No. 05-2628-OP(CON).
 United States Court of Appeals, Second Circuit.
 Argued June 3, 2005.
 Decided June 3, 2005.
 Opinion Revised June 6, 2005.
 
 COPYRIGHT MATERIAL OMITTED Thomas E. Redburn, Jr., Lowenstein Sandler PC (Lawrence M. Rolnick, on the brief), New York, NY, for Petitioners W.R. Huff Asset Management Co., LLC, Appaloosa Management, L.P. and Franklin Mutual Advisers LLC.
 Judith L. Spanier, Abbey Gardy LLP (Arthur N. Abbey, Richard B. Margolies, on the brief), New York, NY, for Petitioner Eminence Capital LLC, (Richard L. Stone, Mark A. Strauss, Kirby McInerney & Squire LLP, New York, NY, on the brief for Petitioners Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd., and Argent Lowlev Convertible Arbitrage Fund Ltd., and the Commonly-Managed Funds UBS O'Connor LLC F/B/O UBS Global Equity Arbitrage Master Ltd., and UBS O'Connor LLC F/B/O UBS Global Convertible Portfolio).
 Christopher J. Clark, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, Richard D. Owens, Robin L. Baker, Assistant United States Attorneys, on the brief), New York, NY, for the United States of America.
 Lawrence G. McMichael, Dilworth Paxson LLP, Philadelphia, PA, for the Rigas Family (Gerard S. Catalanello, Shannon R. Wing, Brown Raysman Millstein Felder & Steiner LLP, New York, NY, on the brief for the Rigas Family, Paul G. Grand, Jeremy H. Temkin, Morvillo, Abramowitz, Grand Iason & Silberberg, P.C., New York, NY, on the brief for Timothy J. Rigas, Peter Fleming, Jr., Benard V. Preziosi, Jr., on the brief for John J. Rigas).
 Before: SOTOMAYOR, and HALL, Circuit Judges.*
 HALL, Circuit Judge.
 
 
 1
 Before us are two petitions for a writ of mandamus brought by W.R. Huff Asset Management Co., LLC, et al. ("the Huff Petitioners") and Eminence Capital, LLC, et al. ("the Class Action Petitioners" and, together with Huff Petitioners, "the Petitioners"). Both petitions seek to vacate a settlement agreement of a forfeiture action among the United States and John J. Rigas, Timothy J. Rigas, and other members of the Rigas family that establishes a $715 million fund to compensate victims of a fraud perpetrated in part by John J. Rigas and Timothy J. Rigas. Both petitions are based on the recently-enacted Crime Victims' Rights Act of 2004 ("CVRA" or "the Act"), 18 U.S.C. § 3771.
 
 
 2
 Because the district court did not abuse its discretion in approving the settlement agreement, we deny both petitions.
 
 I. Background
 A. Facts
 
 3
 In July 2004, a jury found John J. Rigas and Timothy J. Rigas ("the Rigases") guilty of securities fraud, conspiracy to commit securities fraud, false statements in Securities and Exchange Commission ("SEC") filings, and bank fraud. See Dist. Ct. Dkt. Sht. No. 02-cr-1236 at 7/8/04 Entry. The jury acquitted Michael J. Rigas on various charges in the indictment and deadlocked on others. The Government has indicated its intent to retry Michael Rigas on the deadlocked charges.
 
 
 4
 The Petitioners and their clients allege they purchased high-yield debt securities issued by Adelphia Communications Corporation ("Adelphia"), a company founded by John J. Rigas, in reliance on materially false and misleading statements, resulting in money damages to them. See Huff Mot. at 6-7. Apart from the criminal case, the Petitioners, along with other plaintiffs, filed individual actions against the Rigases and other defendants—including Deloitte & Touche LLP, investment and commercial banks, and lawyers—under various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. See Dist. Ct. Dkt. Sht. No. 03-md-1529. The actions are still pending in the district court. See id. The SEC has also brought a civil action under the Securities Exchange Act of 1934 against, among others, John J. Rigas, Timothy J. Rigas, Michael J. Rigas, and James Rigas. See Dist. Ct. Dkt. Sht. No. 02-cv-5776.
 
 
 5
 In April 2005, the Government entered into a proposed settlement agreement ("the Settlement Agreement") with the Rigases and other members of the Rigas family who had either not been named or were not convicted in the criminal action.[1] See Huff Mot. at Exh. D (Settlement Agreement). Under the Settlement Agreement, the entire Rigas family consented to forfeiture of designated assets, including numerous cable television systems, companies, Adelphia securities, and real estate holdings. See id. at ¶¶ 1-4. In exchange, the Government agreed not to request an order of restitution or a criminal fine against John J. Rigas and Timothy J. Rigas at their sentencing and not to seek "further forfeiture, restitution, fine or other economic sanction or recovery in relation to the ownership, control or management of Adelphia by the Rigas Family." Id. at ¶¶ 9-10. Paragraph 8 of the Settlement Agreement further provided, in relevant part:
 
 
 6
 As a condition to receiving a distribution from the forfeited assets or the Victim Fund, the Attorney General shall require any such victim recipient, other than Adelphia, to release and discharge the Rigas Family (except for John J. Rigas and Timothy J. Rigas) and Peter L. Venetis from any and all actions, claims or liabilities of any nature in relation to the ownership, control or management of Adelphia by the Rigas Family, ... and to dismiss any such claim or litigation commenced by such recipient against the Rigas Family (except for John J. Rigas and Timothy J. Rigas) or Peter L. Venetis. Such recipients shall also reduce and mark satisfied any judgment that they obtain against third parties, or otherwise indemnify the Rigas Family (except for John J. Rigas and Timothy J. Rigas) and Peter L. Venetis, to the extent of any liability (for contribution, indemnity or the like) of the Rigas Family (other than John J. Rigas and Timothy J. Rigas) or Peter L. Venetis to the third party on account of such judgment.
 
 
 7
 Huff Mot. at Exh. D at ¶ 8.
 
 
 8
 At the same time, the Government also entered into a non-prosecution agreement with Adelphia. See Huff Mot. at Exh. H (Letter). The non-prosecution agreement provided that, if Adelphia forbore from criminal activity and continued to cooperate with the Government, the Government would not charge the company for the criminal actions of its executives relating to the crimes of which the Rigases were convicted. See id. The non-prosecution agreement also provided that Adelphia would pay the Government $715 million for a victim compensation fund ("Victim Fund"), which would distribute funds to eligible victims "in such forms and amounts as determined by the Attorney General and the SEC, in their sole discretion, subject to any applicable court approval process." Id. at 3.
 
 
 9
 On April 25, 2005, the Government moved for the district court to designate the case as one with "multiple crime victims," under subsection (d)(2) of the Crime Victims' Rights Act of 2004 ("CVRA"), codified at 18 U.S.C. § 3771. See Huff Mot. at Exh. F (Order) at Exh. 1 (Affirmation). The Government argued that there were tens of thousands of victims of the crimes committed by the Rigases and that it was virtually impossible to identify and notify each victim personally. See id. at 3. The Government proposed an alternative plan for notification, involving a listing of the settlement and other agreements reached with Adelphia and the Rigases at a website maintained by the Department of Justice. See id. at 4-5. The district court filed an order directing any person or entity wishing to be heard concerning the Settlement Agreement to make a written submission by May 10, 2005, and the court scheduled a hearing on the Government's motion for May 18, 2005. See Huff Mot. at Exh. F (Amended Order). Petitioners objected to the settlement, raising arguments under the CVRA. See Huff Mot. at Exh. C, Class Action Mot. at Exh. 4.
 
 
 10
 At the May 18 hearing, the Government described to the district court the numerous steps it had taken to notify potential victims of the proposed settlement. See Huff. Mot. at Exh.G (Transcript) at 2-3. Those steps included: On April 26, 2005, the Government provided the bankruptcy court presiding over the bankruptcy action brought by Adelphia against the Rigases with copies of the proposed Settlement Agreement and other agreements and served the parties listed in the bankruptcy proceedings with notice of the settlement. In addition, the Government contacted the company and the equity committee involved in the Adelphia bankruptcy proceedings and asked them to provide information about the proposed agreements to any potential victims. The Government also submitted the agreements to the district court hearing the civil action brought by the SEC against various members of the Rigas family. The Government further held a press conference during which it disseminated information about the agreements on national television and issued a press release to media outlets throughout the United States. On April 27, 2005, the Government posted on its designated website copies of the proposed settlement and other agreements, along with contact information for the victim witness coordinator at the United States Attorney's Office in the Southern District of New York.
 
 
 11
 At the May 18 hearing, various objectors, including the Petitioners herein, were heard and the following colloquy, inter alia, occurred:
 
 
 12
 THE COURT: Tell me what [the Government] should do now that they have not done and how long it would take and what impact that would have on the sentence [of the Rigases].
 
 
 13
 [Attorney for Class Action Petitioners]: Your Honor, there is no question that hiring the claims administrator tomorrow and sending out notice to determine who the victims are and how to allocate those funds would delay the sentencing set for June 1. But I think the government —
 
 
 14
 THE COURT: How long would it delay it? Months?
 
 
 15
 [Assistant United States Attorney]: Years.
 
 
 16
 [Attorney for Class Action Petitioners]: I think, your Honor, it would certainly delay the matter for months.
 
 
 17
 THE COURT: Yes. That's unacceptable. That is unacceptable. You would have to satisfy me that that type of a delay was necessary to ensure compliance with the statute and fairness to the victims and would be of sufficient value to run the risk of this whole global settlement coming apart.
 
 
 18
 Huff Mot. at Exh. G. (Transcript) at 11. At the conclusion of the hearing, the district court accepted the settlement, subject to the approval of (1) the district court judge presiding over the action brought against the Rigases by the SEC, and (2) the bankruptcy judge presiding over the action brought by Adelphia against the Rigases and other parties.[2] See id. at 19-20. The district court found that "[o]bviously, the settlement order entails the interests of many diverse parties and reflects obvious compromises," but that "[t]he alternatives to this settlement are not at all attractive, not only in terms of the complexity and the contingencies which would result." Id. The district court filed an opinion and order consistent with its oral opinion. See Huff Mot. at Exh. A.
 
 B. Huff's Mandamus Petition
 
 19
 The Huff Petitioners argue that mandamus relief is warranted because the Settlement Agreement violates the CVRA—specifically §§ 3771(a)(6) and (8)—in that it subjects them to "a Hobson's choice of either foregoing compensation from the approximately $715 million in Victim Fund proceeds or accepting a distribution (under an as-yet unknown plan of allocation) under unreasonable constraints that unnecessarily jeopardize the viability of their civil claims against other participants in the Adelphia fraud." See Huff. Mot. at 15. According to the Huff Petitioners, the settlement violates the victims' rights under the CVRA to be treated fairly and to be provided with full and timely restitution. See id.
 
 
 20
 The Huff Petitioners further contend that paragraph 8 of the Settlement Agreement is unfair under the CVRA because the Settlement Agreement violates the Mandatory Victim Restitution Act ("MVRA"), codified at 18 U.S.C. § 3663A, by making "it virtually impossible for victims to obtain anything close to full recovery for their losses." See id. at 18. They argue that the Settlement Agreement "places victims in a worse position than they would be in had the Court ordered the Rigas Defendants to pay restitution under the MVRA." Id. at 23.
 
 
 21
 C. Class Action Petitioners' Mandamus Petition
 
 
 22
 The Class Action Petitioners also assert that they were denied their right to restitution, arguing that "[t]he Government sought an order designating this matter as a case involving multiple crime victims in order to avoid the victims' right to full and timely restitution" and that "[t]he District Court ignored the Government's failure to satisfy its obligations under the [CVRA] and under the [Attorney General] Guidelines [for Victim and Witness Assistance]." See Class Action Petition, 22, 24. With respect to the notification provision of the CVRA, they contend that the Government failed to make its "best efforts" to identify and personally notify all the crime victims, as required by § 3771(c). See id.
 
 
 23
 The Class Action Petitioners also contend that they were not afforded an opportunity to confer with the Government concerning the disposition of the case—a right enumerated in § 3771(a)(5). See id. at 21-22. In addition, they argue that: (1) the district court did not have the authority to approve the Settlement Agreement at the May 18 hearing because the notice to victims merely stated that the hearing was for the purpose of addressing the Government's motion to use alternative victim-notification procedures, not for approving the settlement; (2) the non-prosecution agreement between Adelphia and the Government violated laws governing civil and criminal forfeitures; and (3) the district court improperly rejected the Class Action Petitioners' challenges to the Government's proposed notice procedures because those procedures omitted material facts and violated federal and New York laws. See id. at 24-29.
 
 
 24
 II. Statutory Framework and Standard of Review
 
 
 25
 Enacted in October of 2004, the CVRA provides "crime victim[s]" with the following eight rights:
 
 
 26
 (1) The right to be reasonably protected from the accused.
 
 
 27
 (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
 
 
 28
 (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
 
 
 29
 (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
 
 
 30
 (5) The reasonable right to confer with the attorney for the Government in the case.
 
 
 31
 (6) The right to full and timely restitution as provided in law.
 
 
 32
 (7) The right to proceedings free from unreasonable delay.
 
 
 33
 (8) The right to be treated with fairness and with respect for the victim's dignity and privacy.
 
 
 34
 18 U.S.C. § 3771(a). "In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded" these rights. Id. at § 3771(b). If, however, "the court finds that the number of crime victims makes it impracticable to accord all of the crime victims the rights described in subsection (a), the court shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings." Id. at § 3771(d)(2).
 
 
 35
 Pursuant to the mechanism set forth in the CVRA, the crime victim, the crime victim's lawful representative, and the Government "may assert the rights described in [§ 3771(a)]." Id. at § 3771(d)(1). These rights must first be "asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred." Id. at § 3771(d)(3). The district court "shall take up and decide any motion asserting a victim's right forthwith." Id. If the court denies relief, "the movant may petition the court of appeals for a writ of mandamus." Id. The court of appeals shall, in turn, "take up and decide" the petition "within 72 hours after the petition has been filed." Id.
 
 
 36
 This Court has often characterized a writ of mandamus as an "extraordinary remedy." United States v. Coppa (In re United States), 267 F.3d 132, 137 (2d Cir.2001). Ordinarily, this Court grants mandamus relief when the district court has usurped power or clearly abused its discretion. See Bulow v. Bulow (In re von Bulow), 828 F.2d 94, 97 (2d Cir.1987) (stating that the "touchstones" for exercise of mandamus are a showing of "usurpation of power, clear abuse of discretion and the presence of an issue of first impression"). Accordingly, "`mere error, even gross error in a particular case, as distinguished from a calculated and repeated disregard of governing rules, does not suffice to support issuance of the writ.'" In re "Agent Orange" Product Liability Litigation, 733 F.2d 10, 13 (2d Cir.1984) (quoting United States v. DiStefano, 464 F.2d 845, 850 (2d Cir.1972)). Pursuant to this standard, the petitioner must usually demonstrate: (1) the presence of a novel and significant question of law; (2) the inadequacy of other available remedies; and (3) the presence of a legal issue whose resolution will aid in the administration of justice. Coppa, 267 F.3d at 137-38; In re United States, 10 F.3d 931, 933 (2d Cir.1993).
 
 
 37
 Under the plain language of the CVRA, however, Congress has chosen a petition for mandamus as a mechanism by which a crime victim may appeal a district court's decision denying relief sought under the provisions of the CVRA. See 18 U.S.C. § 3771(d)(3) ("the movant may petition the court of appeals for a writ of mandamus"); § 3771(d)(5)(B) ("A victim may make a motion to re-open a plea or sentence only if ... the victim petitions the court of appeals for a writ of mandamus within 10 days ...."). It is clear, therefore, that a petitioner seeking relief pursuant to the mandamus provision set forth in § 3771(d)(3) need not overcome the hurdles typically faced by a petitioner seeking review of a district court determination through a writ of mandamus.
 
 
 38
 Because crime victims, as petitioners for mandamus, have a right to appellate review, we must determine the appropriate standard of that review. "For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable for `abuse of discretion')." Pierce v. Underwood, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). In Pierce, the Supreme Court determined that a district court's decision concerning an attorneys'-fees provision of the Equal Access to Justice Act was entitled to abuse of discretion review because: (1) the language of the statute emphasized that the determination to award attorneys' fees was one for the district court to make; (2) the district court was better positioned than the court of appeals to decide the issue in question, as it may have had "insights not conveyed by the record"; and (3) the problem was non-amenable to regulation by rule because of the "diffuseness of circumstances, novelty, vagueness, or similar reasons." Id. at 559-62, 108 S.Ct. 2541.
 
 
 39
 Similarly, the CVRA provides that the determination to "ensure" that the crime victim is afforded the rights enumerated in the CVRA is entrusted to the district court to make. See 18 U.S.C. § 3771(b). Further, the district court is in a better position than this Court to decide whether or not relief is warranted under the CVRA—and whether the Settlement Agreement is appropriate—as it has far more insight into the complexities of a pending litigation than does a court of appeals. Most of the rights provided to crime victims under the CVRA require an assessment of "reasonableness." 18 U.S.C. § 3771(a)(1), (2), (4), (5) and (7). The district court is far better positioned to make these assessments and to determine what constitutes "a reasonable procedure" for effecting these rights, 18 U.S.C. § 3771(d)(2), than a court of appeals.
 
 
 40
 The Supreme Court has noted that "neither a clear statutory prescription nor a historical tradition exists" to determine which standard of review to apply under the Equal Access to Justice Act. Pierce, 487 U.S. at 558, 108 S.Ct. 2541. The same observation applies to the CVRA. Because the factors that warranted application of the abuse of discretion standard of review for the Equal Access to Justice Act apply with equal force to the CVRA, we hold that a district court's determination under the CVRA should be reviewed for abuse of discretion.
 
 III. Discussion
 A. The Right to Restitution
 
 41
 The principal argument made by both sets of petitioners is that the Settlement Agreement, by requiring releases of third parties, unfairly compromises the right of crime victims to receive full restitution. Specifically, the petitioners contend that (1) the $715 million Victim Fund that will be made available to victims will not have the capacity to provide full restitution to the many victims of the Rigases' crimes; and (2) paragraph 8 of the Settlement Agreement, which releases members of the Rigas Family (except for John J. and Timothy J. Rigas) from liability and indemnifies them from judgments against third parties, also jeopardizes the victims' ability to obtain full restitution from parties who might be found jointly and severally liable with the Rigases.
 
 
 42
 Petitioners assert that § 3771(a)(6) entitles them to "full and timely restitution," omitting to mention, however, that such restitution must be "as provided in law." See 18 U.S.C. § 3771(a)(6). This important modifier makes it clear that Congress recognized that there would be numerous situations when it would be impossible for multiple crime victims of the same set of crimes to be repaid every dollar they had lost. The question before us is whether the district court abused its discretion by approving the Settlement Agreement, given its obligation under the CVRA to ensure that the victims are afforded rights to restitution as provided by law. We hold that the district court did not.
 
 
 43
 Under the MVRA, victims of any offense against property under Title 18, including any offense committed by fraud or deceit, are not entitled to mandatory restitution if the district court determines that "the number of identifiable victims is so large as to make restitution impracticable," or that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3). Thus, the MVRA provides that, under these two circumstances, victims are not entitled to mandatory restitution. The district court determined that the victims in this case were numerous and that the complexity of resolving a multitude of factual and causal issues would extend the sentencing process inordinately. As a basic predicate to this complexity, it is undisputed that there are potentially tens of thousands of victims of the Rigases' crimes. Second, the amount of losses of those victims has not been established and doing so would indisputably take a great deal of time. Clearly, this case fits within the dual exceptions contained in the MVRA, and the district court did not abuse its discretion by deciding to accept the provisions of the Settlement Agreement as reasonable substitute restitution, as permitted by the MVRA.
 
 
 44
 Further, the CVRA does not grant victims any rights against individuals who have not been convicted of a crime. Concomitantly, neither the Government nor the sentencing court are restricted by the CVRA from effecting reasonable settlement or restitution measures against non-convicted defendants. To the extent that the Government recognizes that victims would have difficulty in effecting any recoveries from the Rigas family members because of difficulties in proof of culpability and because of security interests affecting the family's assets, petitioners cannot meet their burden in showing that the Government or the district court acted unreasonably in entering the Settlement Agreement or approving it. Additionally, the district court in no way treated the victims unfairly or without "respect for [their] dignity and privacy," 18 U.S.C. § 3771(a)(8), but rather took into consideration the numerosity of victims, the uncertainty of recovery, and the prospect of unduly prolonging the sentencing proceedings when adopting the settlement, factors which Congress has required the court to consider. See 18 U.S.C. § 3771(d)(2).
 
 B. Other Rights Asserted by Petitioners
 
 45
 Petitioners' other arguments unrelated specifically to restitution come in a variety of forms. They assert variously that some victims were denied rights to confer with the attorney for the Government; that the manner of obtaining forfeited assets as part of the Victims Fund violates regulations regarding sharing of forfeited assets with those who committed the crimes at issue; and that they did not get notice of certain aspects of the various settlement agreements in the other court forums that made up the entire interconnected plan for ensuring that $715 million is available for distribution to the victims. As to each of these arguments, they are either without factual support or a legal basis, or they were implicitly considered in an appropriate fashion by the district court in its extensive successful efforts to provide notice of the proposed settlement and to solicit and hear objections to it.
 
 
 46
 First, no petitioner has alleged that it asked the Government to confer with it and was denied the opportunity to do so. Nothing in the CVRA requires the Government to seek approval from crime victims before negotiating or entering into a settlement agreement. The CVRA requires only that the court provide victims with an opportunity to be heard concerning a proposed settlement agreement, and the court provided the victims with a full opportunity to do so in this case. Second, the district court did not abuse its discretion by approving a settlement that would send funds to Adelphia, because the Government may by statute compromise claims in the context of a forfeiture. See 21 U.S.C. § 853(i)(2). Finally, the district court did not abuse its discretion in determining that, given the time delays and the difficulty of identifying victims and calculating losses, the Government gave reasonable notice to crime victims in the extensive alternative notice procedures it employed.
 
 IV. Conclusion
 
 47
 For the foregoing reasons, we hold the district court did not abuse its discretion in approving the Settlement Agreement at issue and DENY the petitions for mandamus.
 
 
 
 Notes:
 
 
 *
 The Honorable Joseph M. McLaughlin and Chester J. Straub, Circuit Judges, originally members of this panel, recused themselves from consideration of the petition. The Honorable Sonia Sotomayor and Peter W. Hall, Circuit Judges, who are in agreement, have decided the petition pursuant to 2d Cir. R. § 0.14(b)See also 18 U.S.C. § 3771(d)(3) (permitting a single judge to issue a writ of mandamus pursuant to circuit rule or the Federal Rules of Appellate Procedure).
 
 
 [1]
 These individuals are Doris Rigas, Michael J. Rigas, James P. Rigas, Ellen Rigas Venetis, and their affiliated entitiesSee Mot. at Exh. D at 1.
 
 
 [2]
 Both the district court judge presiding over the SEC action and the bankruptcy judge have since approved the global settlement